IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:15-cv-01633- RBJ-NYW

THE FOURTH CORNER CREDIT UNION,
a Colorado state-chartered credit union,

       Plaintiff,

v.

FEDERAL RESERVE BANK OF KANSAS CITY,

       Defendant.

---

## DEFENDANT FEDERAL RESERVE BANK OF KANSAS CITY'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Federal Reserve Bank of Kansas City ("FRB-KC") moves to dismiss with prejudice Plaintiff The Fourth Corner Credit Union's ("TFCCU") Complaint for failure to state a claim.

## <u>INTRODUCTION</u>

TFCCU is a Colorado chartered credit union formed for the express purpose of providing banking services to marijuana and hemp businesses.[1] TFCCU has been denied a master account at the FRB-KC that would give TFCCU access to the Federal Reserve payment system. Without the master account, TFCCU says it cannot operate and provide the banking services it insists Colorado's fledgling marijuana industry needs.

---

[1] TFCCU's charter is distinguishable from other financial institutions providing banking services to marijuana-related entities, as those entities are not formed for the express purpose of serving persons, businesses, and organizations that support the cannabis and hemp industries. *See* Compl. ¶ 38.

Marijuana, however, is classified as a Schedule 1 drug under the Controlled Substances Act. The manufacture, sale or distribution of marijuana is a federal crime. Aiding and abetting in the manufacture, sale or distribution of marijuana is also a federal crime. Nonetheless, TFCCU now asks this Court to <u>mandate</u>, pursuant to an inapplicable statute, that FRB-KC (which the Complaint acknowledges is a "fiscal agent" of the United States Government) facilitate TFCCU and its members' federally illegal pursuits. The Complaint must be dismissed for three reasons:

First, actions by the State of Colorado in contravention of the Controlled Substances Act are preempted and void under the Supremacy Clause. Thus, Colorado's grant of a charter to TFCCU—an entity created for the express purpose of aiding and abetting the sale and distribution of marijuana—is void under the Supremacy Clause and TFCCU cannot bring this litigation. Plaintiff already indirectly concedes the conflict in the Complaint. (*See* Compl. ¶ 34.)

Second, TFCCU asks this Court for a mandatory injunction in service of an illegal end. Such an injunction would adversely affect the public interest. It is a time-honored principle that no court, Federal or otherwise, will grant relief that assists or furthers an illegal purpose.

Third, TFCCU asks the Court to hold that FRB-KC <u>must</u> issue TFCCU a master account pursuant to an inapplicable statute that, by its plain language, pertains only to the "principles" for setting a "schedule of fees." 12 U.S.C. § 248a(c). The cited statute does not mandate that FRB-KC grant any entity—let alone TFCCU—a master account. It requires only that a Federal Reserve bank not discriminate in the setting of fees among depository institutions.

## BACKGROUND

The manufacture and distribution of marijuana is prohibited by federal law. *See, e.g.*, *Gonzales v. Raich*, 545 U.S. 1, 14 (2005); *see also* 21 U.S.C. § 841(a)(1); *id.* § 802(6); *id.* § 812.

Federal law also criminalizes aiding and abetting the manufacture, distribution, and dispensing of marijuana. *See* 18 U.S.C. § 2; 21 U.S.C. § 846. Even transporting or transmitting funds known to have been derived from the distribution of marijuana is illegal under federal law. *See* 18 U.S.C. § 1960. Colorado law, by contrast, provides a framework to allow the distribution and consumption of marijuana. *See* Colo. Const. art. XVIII, § 16. The Complaint concedes that Colorado's laws—like the laws of many other States—"currently conflict with the federal Controlled Substances Act." (Compl. ¶ 34.)

In light of the significant marijuana industry in Colorado, TFCCU was formulated to "provide much needed banking services to compliant, licensed cannabis and hemp businesses," in addition to "thousands of persons, businesses and organizations that supported the legalization of marijuana." (Compl. ¶¶ 34-35.) It was intended to provide services to individuals and businesses manufacturing and distributing marijuana, as many marijuana businesses allegedly "are forced to operate in cash only, and to suffer the high cost of handling and safeguarding this cash." (*Id.* ¶ 34.)

In April 2014, TFCCU applied to the Colorado Division of Financial Services ("Colorado DFS") "for a *de novo* state credit union charter to serve a field of membership of persons, businesses, and organizations that support the legalized cannabis and hemp industries." (Compl. ¶ 38.) Colorado DFS granted TFCCU the charter. (*Id.* ¶ 40.) However, TFCCU was subsequently denied federal deposit insurance by the National Credit Union Administration ("NCUA") and was denied a master account at the FRB-KC. (Compl. ¶¶ 112, 116.)

In light of those denials, TFCCU sues,[2] asking this Court to "direct[] FRB-KC to immediately grant TFCCU . . . a master account at FRB-KC." (Compl. Prayer for Relief.) A master account at a Federal Reserve Bank would give TFCCU, formed expressly to provide banking services to cannabis and hemp businesses, access to the Federal Reserve payment system. (Compl. ¶¶ 2, 53.)

## ARGUMENT[3]

**I.     THE COMPLAINT MUST BE DISMISSED BECAUSE THE STATE OF COLORADO'S ACTS TO FACILITATE BANKING SERVICES FOR THE DISTRIBUTION OF MARIJUANA ARE PREEMPTED BY FEDERAL LAW**

The Court must dismiss TFCCU's Complaint because any affirmative legal action that Colorado takes to facilitate the distribution of marijuana is preempted by federal law.  In unequivocal terms, the United States Constitution provides that the Constitution and the laws of the United States, "which shall be made in Pursuance thereof, . . . shall be the supreme Law of the Land." U.S. Const. art. IV, cl. 2. "It is basic to this constitutional command that all conflicting state provisions be without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). Federal law also preempts actions of state agencies that conflict with federal law. *See, e.g.*, *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 648 (2002) (jurisdiction over preemption argument concerning order of state utility commission). Federal law may even preempt state laws of general applicability to the limited extent that they conflict

---

[2] TFCCU has separately sued NCUA in this Court. (*See* Compl. ¶ 112.)

[3] "In reviewing a motion to dismiss, the Court must accept the well-pleaded allegations of the complaint as true and construe them in [TFCCU's] favor. However, the facts alleged must be enough to state a claim for relief that is plausible, not merely speculative." *Chavez-Torres v. City of Greeley*, No. 14-CV-01187-RBJ, 2015 WL 1850648, at *2 (D. Colo. Apr. 21, 2015). Of course, the Court need not accept as true legal conclusions contained in the Complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

with, or obstruct, the federal law. *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 386 (1992) (preempting guidelines pursuant to general consumer protection statutes to extent conflict with Airline Deregulation Act). Courts "may grant judgment as a matter of law under Federal Rule of Civil Procedure 12(b)(6) on the basis of" preemption. *Caplinger v. Medtronic, Inc.*, 784 F.3d 1335, 1341 (10th Cir. 2015).

Congress may expressly define the extent to which it intends to pre-empt state law. *Mich. Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 469 (1984). Congress may also occupy an entire field of regulation, or pre-empt state law to the extent of actual conflict, which includes when compliance with both state and federal law is impossible or "when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (quotation omitted). To determine whether there is a conflict, the Court must "consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." *Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977).

Congress has long regulated marijuana in "[p]ursuance" of the Constitution. *See, e.g.*, *Raich*, 545 U.S. at 11-13. Congress does—and, according to clear Supreme Court precedent, may—regulate, through prohibition, the "entire class" of marijuana use, possession, and commerce. *See id.* at 17, 22, 27. The Controlled Substances Act ("CSA"), 21 U.S.C. § 801 et seq., "prohibits the manufacture and distribution" of marijuana. *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 486 (2001). It is also illegal under federal law to aid or abet the manufacture or distribution of marijuana. *See* 18 U.S.C. § 2. And it is illegal to knowingly conduct, manage, supervise, or control a money transmitting business that involves

the transportation or transmission of funds known to have been derived from a criminal offense, or intended to support unlawful activity. 18 U.S.C. § 1960. "[L]imiting the activity to marijuana possession and cultivation 'in accordance with state law' cannot serve to place . . . activities beyond congressional reach." *Raich*, 545 U.S. at 29.

The CSA by its terms preempts State law where "there is a positive conflict between that provision of [the CSA] and that State law so that the two cannot consistently stand together." 21 U.S.C. § 903. The Court, however, must also engage in an implied obstacle preemption analysis. *See Emerald Steel Fabricators, Inc. v. Bureau of Labor & Indus.*, 230 P.3d 518, 527 (Or. 2010) (citing *Wyeth v. Levine*, 555 U.S. 555, 567 (2009)).[4] The "main objectives" of the CSA are "combating drug abuse and controlling the legitimate and illegitimate traffic in controlled substances." *Gonzales v. Oregon*, 546 U.S. 243, 250 (2006). "[T]he CSA creates a comprehensive, closed regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing, and possession of substances classified in any of the Act's five schedules." *Id.* And "Section 903's intent and function is clear—none of the federal anti-drug statutes, including Section 841, are intended to prevent the states from also criminalizing or regulating illegal drugs." *United States v. Leal*, 75 F.3d 219, 227 (6th Cir. 1996) (emphasis added). Thus, while state laws that support criminalization of illegal drugs are not preempted, laws that purport to support distribution or manufacturing of those drugs are preempted as in conflict with the federal prohibition.

---

[4] Cases holding to the contrary predate *Wyeth. See, e.g.*, *Pack v. Superior Court*, 199 Cal. App. 4th 1070, 132 Cal. Rptr. 3d 633, 648 (2011) *review granted and opinion superseded sub nom.* Pack v. S.C., 268 P.3d 1063 (Cal. 2012) (noting that *Cnty. of San Diego v. San Diego NORML*, 81 Cal. Rptr. 3d 461, 481 (2008), was decided before *Wyeth*).

The "Cole Memorandum" and the "FinCEN guidance" discussed at some length in the Complaint do not change that analysis. *See United States v. Heying*, No. 14-CR-30 JRT SER, 2014 WL 5286153, at *14-15 (D. Minn. Aug. 15, 2014) (stating that the "Cole Memo" and similar documents "do not exempt from prosecution those involved in the distribution of marijuana"). Colorado's affirmative actions in support of the legalization of marijuana, and its affirmative actions to encourage and catalyze others to aid and abet the manufacture and distribution of marijuana, positively conflict with the CSA—not to mention create obstacles to the accomplishment and execution of the full purposes and objectives of Congress—and cannot stand consistently with the CSA.

Despite TFCCU's overt intent to offer services and assistance specifically for businesses engaged in conduct prohibited by federal law, the Complaint alleges that the Colorado DFS granted TFCCU "a state credit union charter." (Compl. ¶ 39; *see also* ¶¶ 2, 162-63 (alleging role of Colorado DFS in creation and regulation of TFCCU).) TFCCU was created, "[c]onsistent with" its charter, to serve "compliant state licensed cannabis and hemp businesses." (*Id.* ¶ 2; *see also, e.g.*, *id.* ¶ 103 (noting "nearly all-cash nature of Colorado state legal cannabis businesses" that credit union would address); ECF No. 16 at 2.)

Colorado's affirmative actions that positively conflict with the CSA and the prohibition against aiding and abetting violations of federal law are preempted by federal law and the Supremacy Clause.[5] *See, e.g.*, *Emerald Steel Fabricators*, 230 P.3d at 531 (finding state laws

---

[5] Because Colorado has affirmatively acted to facilitate the distribution of marijuana and, through the creation of the credit union, to facilitate the aiding and abetting of the distribution of marijuana, this case is distinguishable from those holding that a state need not affirmatively ban marijuana or enforce federal laws. *See, e.g.*, *Ter Beek v. City of Wyoming*, 846 N.W.2d 531, 537-38 (Mich. 2014); *San Diego NORML*, 81 Cal. Rptr. 3d at 483 (2008). Certiorari was recently

authorizing marijuana use preempted and stating "if federal law prohibited all sale and possession of alcohol, a state law licensing the sale of alcohol and authorizing its use would stand as an obstacle to the full accomplishment of Congress's purposes.").

In light of the CSA, Colorado lacks the power to grant a credit union charter with the knowledge that the credit union is designed to aid and abet violations of federal law by offering banking services to businesses engaged in the manufacture and/or distribution of marijuana. *See Mich. Canners*, 467 U.S. at 478 (Michigan act that allows conduct that federal act forbids preempted). Any attempt to do so—including "Charter No. 272"—is void and without effect. The Court would not entertain other such attempts—such as if Colorado enacted a scheme to allow trade with North Korea in derogation of federal laws, and then chartered a credit union to handle the finances for companies conducting such illegal trade. Similarly, the Court would not recognize a credit union that a State chartered for the purpose of banking funds derived from illegal trade in endangered species. The present situation, similarly, cannot be sanctioned.

Thus, the Court should hold that TFCCU is not an entity recognized under federal law and that the Complaint must be dismissed. Alternatively, the Court should hold that TFCCU is not a state-chartered credit union and as a legal matter is not an institution that can seek access to FRB-KC's services, let alone that <u>must</u> have access to FRB-KC's services. Any alternative holding subverts the Supremacy Clause and the CSA and would allow the State of Colorado to

---

granted in an arguably related case in Colorado. *See People v. Crouse*, No. 14SC109, 2015 WL 3745183 (Colo. June 15, 2015).

make law and render executive actions supreme to the U.S. Constitution and the federal laws in

pursuance thereof.[6]

## II.    THE COMPLAINT MUST BE DISMISSED BECAUSE THE COURT CANNOT USE ITS EQUITABLE POWERS TO FACILITATE CRIMINAL ACTIVITY

"It is well settled that equity will not lend its aid to the perpetration of criminal acts."

*Cartlidge v. Rainey*, 168 F.2d 841, 845 (5th Cir. 1948). That, however, is precisely what TFCCU

requests—to invoke the equitable powers of the Court to force the FRB-KC to issue a master

account, the primary purpose of which is to facilitate the banking of proceeds from the sale of

marijuana.[7] It is axiomatic that the Court cannot compel FRB-KC to take action that furthers

criminal activity. *See Cartlidge*, 168 F.2d at 845.

Courts have consistently denied equitable relief to litigants who seek the court's

intervention as a means of protecting or facilitating criminal conduct. *See, e.g.*, *Combs v. Snyder*,

101 F. Supp. 531, 532 (D.D.C. 1951) (denying preliminary injunction requested by plaintiff who

sought "the intervention of the court for the protection of a criminal business" because "[f]ew

---

[6] Although the Court need not reach the issue to dismiss the case, the "political question doctrine" supports the relief requested. *See Baker v. Carr*, 369 U.S. 186, 217 (1962) (abstention may be based on "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government" or "the potentiality of embarrassment from multifarious pronouncements by various departments of one question"). Indeed, in *Raich*, the Supreme Court described the methods by which the growing conflict between state and federal marijuana laws should be addressed. First, there are administrative procedures for the reclassification of marijuana as Schedule 1 drug. 545 U.S. at 33. "But perhaps more important than these legal avenues is the democratic process, in which the voices of voters allied with these [parties seeking to legalize marijuana] may one day be heard in the halls of Congress." *Id.* Thus, the relief TFCCU seeks here is properly sought before other branches of government.

[7] Although the Complaint purports to seek a declaratory judgment, it in fact requests a permanent injunction without addressing the standards necessary for that relief, including the impact on the public interest. *See eBay Inc. v. MercExchange L.L.C.,* 547 US 388, 391 (2006) (reciting "well-established" factors).

things are clearer than that one who comes seeking protection for conduct that he concedes to be criminal has unclean hands"). Simply put, "[a] court of equity will not permit its process to be perverted to any [illegal] purpose." *Weiss v. Herlihy*, 23 A.D. 608, 614-15 (N.Y. App. Div. 1897). Thus, the Court must dismiss the Complaint with prejudice.

The United States Bankruptcy Appellate Panel for the Tenth Circuit recently addressed a similar issue, determining that a "debtor in the marijuana business" could not obtain relief in a federal bankruptcy court. *In re Arenas*, No. BAP CO-14-046, 2015 WL 5008718, at *1 (10th Cir. BAP (Colo.) Aug. 21, 2015). The court highlighted the tremendous burden to a bankruptcy trustee of being forced to commit crimes related to the distribution of marijuana in the process of administering an estate. *Id.* at *6, *7. It concluded that "the debtors are unfortunately caught between pursuing a business that the people of Colorado have declared to be legal and beneficial, but which the laws of the United States—laws that every United States Judge swears to uphold– proscribe and subject to criminal sanction." *Id.* at *7. Plaintiff is similarly situated in the present matter, and the Court should follow what the Tenth Circuit did in *In re Arenas*.

Moreover, because sale of marijuana remains illegal under federal law, TFCCU's participation in the marijuana industry and desire to facilitate marijuana sales precludes the Court from intervening via injunctive relief on its behalf. Courts have long recognized that "he who seeks equity must come into the court with clean hands." *United States v. Grover*, 119 F.3d 850, 852 (10th Cir. 1997) (internal quotation marks omitted). Equitable relief is proscribed when a party's "misconduct has immediate and necessary relation to the equity that he seeks." *Henderson v. United States*, 135 S. Ct. 1780, 1783 n.1 (2015). Equity will not be "the abetter of iniquity." *Precision Instrument Mfg. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945)

(quotation omitted). Where a suit concerns the public interest, the unclean hands doctrine "assumes even wider and more significant proportions," requiring the Court to prevent a wrongdoer from enjoying the fruits of his transgressions and to avoid injury to the public. *Id.* Even accepting the well-pleaded facts in the Complaint as true, TFCCU has unclean hands and the Court cannot "abet" its "iniquity." The Complaint must be dismissed with prejudice.

## III. THE COMPLAINT MUST BE DISMISSED BECAUSE TFCCU'S LEGAL THEORY RELIES ON AN ERRONEOUS INTERPRETATION OF § 248A

Finally, TFCCU's Complaint must be dismissed because it alleges that FRB-KC <u>must</u> grant it a master account on the basis of an inapplicable statute, 12 U.S.C. § 248a. (Compl., ¶ 26 ("The decision facing the Court turns upon the interpretation and application of 12 U.S.C. § 248(c)(2), the equal access provision of the Monetary Control Act."); *see also id.* ¶ 174; ECF No. 16 at 2 (emphasizing that the "dispositive threshold legal issue" is whether section 248a allows FRB-KC discretion to deny TFCCU a master account).) Thus, the Court must dismiss the Complaint unless it determines, assuming the truth of the well-pleaded factual allegations in the Complaint, that section 248a mandates that FRB-KC issue FCCU a master account. It does not.

To interpret the statute, the Court begins "by examining the statute's plain language. If the statutory language is clear," the analysis is typically over. *United States v. Handley*, 678 F.3d 1185, 1189 (10th Cir. 2012) (quotation omitted); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) ("As in any case of statutory construction, our analysis begins with the language of the statute. And where the statutory language provides a clear answer, it ends there as well." (Citation omitted.)). Indeed, "until a clue emerges suggesting otherwise, it's not unreasonable to think that Congress used the English language according to its conventions." *United States v. Rentz*, 777 F.3d 1105, 1109 (10th Cir. 2015). Only if the statute's "plain language is ambiguous

as to Congressional intent," should the Court "look to the legislative history and the underlying public policy of the statute." *Handley*, 678 F.3d at 1189.

The plain language of section 248a(c) demonstrates that it does not support TFCCU's position. Section 248a relates to the pricing of Federal Reserve Bank services. Section 248a(a) requires the Board of Governors to publish "a set of pricing principles in accordance with this section and a proposed schedule of fees upon those principles for Federal Reserve bank services to depository institutions." § 248a(a). Section 248a(b) identifies the services that "shall be covered by the schedule of fees under subsection (a)"— a list that <u>does not include</u> receiving deposits from depository institutions through a master account.

Finally, section 248a(c), on which TFCCU relies, merely identifies the principles on which the fees should be based:

> The <u>schedule of fees</u> prescribed pursuant to this section <u>shall be based on</u> the following principles: . . .
>
> (2) All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may determine are applicable to member banks.

§ 248a(c) & (c)(2) (emphasis added). By its plain language, the statute regulates the fees charged by the Federal Reserve, and does not require that the Federal Reserve offer a master account to any entity, let alone every entity.

TFCCU's Complaint misinterprets the statute. TFCCU argues "[t]he Monetary Control Act requires the Federal Reserve to provide *all* depository institutions with equal access to Federal Reserve bank services at nondiscriminatory pricing. *See* 12 U.S.C. § 248a(c)(2)."

(Compl. ¶ 24 (emphasis in original); *see also* ¶ 118.) Contrary to TFCCU's misconstruction, the statute instead lays out, as a principle for a "schedule of fees," that Federal Reserve Bank services should not be priced in a discriminatory manner to favor only banks that are members of the Federal Reserve System.[8]

The plain language of the statute is enough to require dismissal. However, the Complaint also alleges that the Monetary Control Act was passed to address pricing discrimination. (*See* Compl. ¶ 24.) Just because Congress required non-discriminatory pricing as between Federal Reserve member and non-member institutions, however, does not mean that Congress intended to force the Federal Reserve Banks to make their services available to all comers, thereby accepting the risks of every feasible depository institution.

As the Complaint alleges, "The Reserve Bank gives all revenue in excess of expenses to the U.S. Treasury." (Compl. ¶ 3.) It would be noteworthy if Congress allowed states to *de facto* control, through the quality of the institutions to which they granted credit union charters, the amount of risk the Federal Reserve Banks assumed (and by extension the amount of money sent to the Treasury). Without regard to the general likelihood of such a statute, it is difficult to imagine that Congress intended to grant the States such control circuitously and by happenstance in section 248a(c), a statute about the "principles" underlying a "schedule of fees."

---

[8] Under section 9 of the Federal Reserve Act, state-chartered banks may, but are not required to, apply to become members of the Federal Reserve System. 12 U.S.C. § 321. Prior to the adoption of the Monetary Control Act of 1980, Federal Reserve bank services were provided free of charge only to Federal Reserve member banks. *See* "The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market," *Economic Review*, Federal Reserve Bank of Richmond, July/August 985, available at https://www.richmondfed.org/publications/research/economic_review/1985/er710403.

Rather, deposit accounts at Reserve Banks—so-called master accounts—are authorized under the first paragraph of section 13 of the Federal Reserve Act ("FRA"), 12 U.S.C. § 342, which has been virtually unchanged since the enactment of the FRA in 1913. That section states in pertinent part: "Any Federal reserve bank _may_ receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items, and also, for collection, maturing notes and bills . . . ." § 342 (emphasis added).

Interpreting that very section, the Supreme Court in 1923 rejected the argument, similar to the one made here, that a Federal Reserve Bank "was obligated to receive for collection any check upon any North Carolina state bank." _Farmers' and Merchants' Bank of Monroe, N.C., v. Federal Reserve Bank of Richmond_, 262 U.S. 649, 662 (1923). The Court described the phrase "may receive" as "words of authorization merely," and declared that "neither section 13, nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation to receive checks for collection. The act merely confers authority to do so. Id. at 662-63. This permissive language in the statute was not changed when the statute was amended to include nonmember banks as entities from which Reserve Banks 'may' receive deposit. _See_ Act of March 31, 1980, 94 Stat. 132, 139.

Congress could not have intended section 248a(c)(2), also enacted in 1980, to overturn the discretion permitted the Reserve Banks since their inception by requiring Reserve Banks to provide services to all comers without regard to risk or other considerations. As the Supreme Court has observed, Congress "does not alter the fundamental details of a regulatory scheme in

vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001).

Section 248a(c)(2) does not require FRB-KC to assume—or, by extension, to impart to the United States—every risk. It only requires that qualified nonmember depository institutions receive services covered by the fee schedule at the same fee schedule available to member institutions, provided that such depository institutions are subject to the same terms as members. Because section 248a does not support TFCCU's position, the Complaint fails to state a claim. It must be dismissed with prejudice.

## CONCLUSION

TFCCU's Complaint fails as a matter of law, a failure that would not be remedied by allegations of additional facts. Amendment, therefore, would be futile. Accordingly, FRB-KC respectfully requests that the Court dismiss the Complaint with prejudice.

Dated:  September 10, 2015          Respectfully submitted,


_s/ Scott S. Barker_
Scott S. Barker
N. Reid Neureiter
Benjamin I. Kapnik
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO  80202-5647
Telephone:   303.244.1800
Facsimile:    303.244.1879
Email:   barker@wtotrial.com
            neureiter@wtotrial.com
            kapnik@wtotrial.com

Attorneys for Defendant,
Federal Reserve Bank of Kansas City

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on this 10th day of September, 2015, a true and correct copy of the foregoing was filed electronically.  Notice of this filing will be sent to all counsel of record by operation of the Court's CM/ECF system.


*s/ Scott S. Barker*