**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:15-cv-01633-RBJ-NYW

THE FOURTH CORNER CREDIT UNION,
a Colorado state-chartered credit union,

Plaintiff,

v.

FEDERAL RESERVE BANK OF KANSAS CITY,

Defendant.

---

## FIRST AMENDED COMPLAINT

---

Plaintiff, complaining of Defendant herein, would respectfully show this Honorable Court as follows:

### NATURE OF PROCEEDINGS

1.     Pursuant to 28 U.S.C. §2201 and Rule 57 of the Federal Rules of Civil Procedure, Plaintiff, The Fourth Corner Credit Union ("TFCCU"), respectfully requests this Court issue a declaratory judgment and injunction directing Defendant, Federal Reserve Bank of Kansas City ("FRB-KC" or the "Reserve Bank") to grant TFCCU, a Colorado state-chartered credit union, a master account at FRB-KC, pursuant to 12 U.S.C. §248a(c)(2) which requires that "All Federal Reserve bank services covered by the fee schedule ***shall be available to nonmember depository institutions*** and such services ***shall be priced at the same fee schedule applicable to member banks***, . . ." and in accordance with (a) Federal Reserve Banks Operating Circular No. 1 (Effective February 1, 2013), and (b) the American Bankers Association Routing Number Administrative Board Routing Number Policy (Revised 3/12).  An actual controversy

exists within this Court's jurisdiction as to the interpretation and application of 12 U.S.C.§248a(c)(2), Federal Reserve Banks Operating Circular No. 1 (Effective February 1, 2013) and the American Bankers Association Routing Number Administrative Board Routing Number Policy (Revised 3/12) such that the Court should declare the rights of TFCCU, the interested party seeking such relief.

## THE PARTIES

2.      Plaintiff, TFCCU, is a Colorado state-chartered credit union. TFCCU was granted Charter No. 272 on November 19, 2014. It is a nonprofit corporation formed and registered on said date.  Its principal place of business is located in the City and County of Denver. It was incorporated pursuant to the applicable provisions of the Colorado Revised Statutes. Said credit union exists, is in good standing, and is authorized to conduct business pursuant to all of the powers conferred upon it by law. TFCCU is currently regulated and supervised solely by the Colorado Division of Financial Services ("DFS").  Consistent with its state credit union charter, and in strict accordance with state and federal laws, regulations and guidance, TFCCU intends to provide banking services to compliant state licensed cannabis and hemp businesses, their employees, industry vendors and any one or more of the thousands of businesses and/or persons that are members of, or who join, one of the non-profit associations designated to be within TFCCU's multiple association common bond field of membership established in TFCCU's Articles and Bylaws.

3.      Defendant, FRB-KC, is a private, independent entity run by its own board of directors. Six of the nine directors are appointed by private commercial member banks that thereby control FRB-KC.  FRB-KC is not run by the Federal Reserve Board of

Governors or any other part of the executive branch. The Reserve Bank acts with sufficient independence under private ownership and control such that it does not qualify as a government corporation. The Reserve Bank is considered a separate corporation owned solely by commercial banks within its district, distinct from the Board of Governors. The United States does not own stock in the Reserve Bank; it acts as the government's fiscal agent and all of the Reserve Bank's profits belong to the United States; it is a private corporation in which the government has an interest. The Reserve Bank is not a department, commission, administration, authority or bureau of the federal government. The Reserve Banks do not have the authority to promulgate regulations having the force and effect of a law, a power that the Board of Governors may not delegate.[1] The Reserve Bank's operation is not government financed. The Reserve Bank gives all revenue in excess of expenses to the U.S. Treasury. No statute designates the Reserve Bank as a federal agency; the Reserve Bank is a tax-exempt federal instrumentality; the Reserve Bank does not need to consult the United States Attorney or even the Board of Governors to pursue legal action. FRB-KC is a regional Reserve Bank that is part of the Federal Reserve System.[2] It is distinct from the Federal Reserve Board of Governors; it is owned and majority controlled by large commercial member banks; it

---

[1] 12 U.S.C.§248(k). The Board of Governors of the Federal Reserve System are authorized and empowered to "delegate, by published order or rule and subject to the Administrative Procedure Act, any of its functions, *other than those relating to rulemaking* or pertaining principally to monetary and credit policies, to . . . Federal Reserve banks." (*emphasis supplied*).

[2] The Federal Reserve System is comprised of 12 regional Reserve Banks located across the country. Each Reserve Bank is overseen by a local Board of Directors composed of community and business leaders from diverse sectors across each of the 12 regions. These directors share governance responsibility for Reserve Bank operations along with the Board of Governors in Washington, D.C., a government agency composed of individuals nominated by the President and confirmed by the Senate to serve 14-year terms. See, *Structure Matters: The Decentralized Federal Reserve*, The Exchequer Club, May 21, 2014, Speaker, Esther L. George, *Page 1*. "The Fed" is the acronym for the Federal Reserve System. The Federal Reserve Act created "a decentralized system that represented the interests of communities from across the country." See, *Robert Owen and His Legacy*: Oklahoma History Center, October 16, 2013, Speaker Esther L. George, *Page 5*. "The Federal Reserve is not a monolithic organization . . . " *Id.*

is directly supervised in its daily operations by a separate board of directors – not the federal government; its employees are not considered federal employees, officials, or representatives for purposes of 12 U.S.C. §341. Federal Reserve Banks are not federal agencies pursuant to 28 U.S.C. §451. FRB-KC serves the Tenth Federal Reserve District, a seven (7) state region, which includes Colorado. It operates a Federal Reserve Branch Bank in the City and County of Denver. Its Denver Branch office acts as the Federal Reserve's connection to this part of the country. FRB-KC's cash processing and distribution in Denver provide currency and coin to financial institutions in Colorado, Wyoming and northern New Mexico, as well as parts of western Kansas and western Nebraska. The Reserve Bank employs bank supervision staff in Denver dedicated to examining many state member banks. It has an active regional and community presence responsible for promoting fair and impartial access to credit and equal access to its payments services across the region. FRB-KC has a "direct channel to Main Street"[3] through its Denver Branch Board of Directors, a seven (7) member branch board of directors that provide real-time insight, advice and counsel that creates the foundation for decision on regional policy. The Reserve Banks provide customer service to financial institutions nationwide that have the legal right to equal access to Federal Reserve products at nondiscriminatory prices. The Reserve Bank supplies payment services[4] to

---

[3] *U.S. Monetary Policy: Risks of Delayed Action*, Colorado Economic Forum, September 26, 2013, Speaker, Esther L. George, Page 3.

[4] *Payments services* include: *Cash Services:* The Fed provides banks with currency and coin to meet public demand. *Electronic Payments*: The Fed moves money electronically between banks. Fedwire funds transfer system processes large payments almost instantly. ACH is used mostly for recurring payments like business payrolls and utility payments. *Check Processing:* The Fed operates a nationwide check clearing system. Banks send paper checks to the Fed for processing, but it now uses mostly electronic images to exchange check data. *U.S. Fiscal Agent:* The Fed acts as fiscal agent for the U.S. government. It maintains the Treasury's checking account and processes electronic payments for the government, including Social Security. A financial institution cannot operate without access to the Fed's payments services. A financial institution is a customer of Fed customer payments services. It is what

the public through depository institutions like banks and credit unions. It has responsibility for regulating and supervising specifically defined segments of the banking industry[5] in Colorado to ensure safe and sound banking practices and compliance with banking laws. It provides financial services in Colorado to banks and credit unions. It provides broad based support to the financial system that underpins the economy of this region. It has a network of "on-the-ground" connections; it employs persons, owns property, and conducts substantial business in this judicial district.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to the following statutes: (a) 28 U.S.C. §1331, providing for "original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States"; (b) 28 U.S.C. §1367, providing for "supplemental jurisdiction over all other claims that are so related to claims within such original jurisdiction that they form part of the same case or controversy"; and (c) 28 U.S.C. §2201, providing for a declaration of rights and other legal relations of any interested party in a case of actual controversy within its jurisdiction.

5.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(1) because Defendant FRB-KC, an entity with the capacity to sue and be sued in its common name,

---

allows money to move from one place to another. The Fed is the bank for all financial institutions (a bank for a bank). The Federal Reserve has a mission to promote economic growth through accessibility to the payments system. See, *The Federal Reserve and the Payments System*: Consumer Payment Innovation in the Connected Age, May 29, 2012, Speaker, Esther L. George, Page 1. "Throughout its history, the Federal Reserve has played an important role as a retail payments operator, enabling it to bring about socially beneficial changes." *Id. at Page 2.* The Federal Reserve plays a "key operator role" in running the retail payments system. *Id at Page 5.* [O]f the various roles a central bank can play in retail payments, the role of regulator should be limited. The Federal Reserve in its role as a key operator of the payments system should serve as an "industry catalyst" that "supports economic growth." *Id. at Page 6.* The Fed is the circulatory system of the economy.

[5] The Federal Reserve is supervisor and regulator of: (a) bank holding companies (including financial holding companies); (b) nonbank subsidiaries of bank holding companies; (c) state banks that are members of the Federal Reserve; (d) savings banks; (e) edge and agreement corporations; and (f) state and federally licensed branches, agencies and representative offices of foreign banks. **The Federal Reserve is *not* a supervisor or a regulator of state-chartered credit unions**.

resides in this judicial district pursuant to 28 U.S.C. 1391(c)(2). FRB-KC has purposefully availed itself of the privilege of conducting business in this District; it maintains a regular place of business in this District; it conducts business in this District; the claim arose in this District; material witnesses are located in this District; and, it is subject to this Court's jurisdiction under C.R.S. §13-1-124, Colorado's long arm statute. TFCCU and FRB-KC have not entered into any agreement containing a forum selection clause.

6.      FRB-KC is not an administrative agency.  There exists no administrative procedure by which TFCCU can obtain a review of the decision of FRB-KC not to approve TFCCU's request for a master account.   The Administrative Procedures Act, 5 U.S.C. §500 *et seq.*, is not applicable to this proceeding.

## THE DUAL BANKING SYSTEM

7.      Historical context is useful in analyzing the present controversy.  The banking system in the United States is described as "dual" because it is made up of separate federal and state component systems. This duality has existed in various forms since the earliest years of our nation, and while the federal and state components of the system have evolved in structure over the years, the essential characteristics of the system's duality have not. The federal system is based on a federal bank charter, powers defined under federal law, operation under federal standards, and oversight by a federal supervisor. The state system is characterized by state chartering, bank powers established under state law, and operation under state standards, subject to state supervision. As Professor Kenneth Scott wrote in his landmark analysis of the dual banking system, the "very core of the dual banking system is the simultaneous existence of different

regulatory options that are not alike in terms of statutory provisions, regulatory implementation and administrative policy."[6]

8.      Over the past 153 years the dual banking system in the United States has remained firmly anchored in the modern world of banking and finance.  Over this time, "financial markets in the United States have developed into world-class centers of capital and have led financial innovation."[7]

9.      Thousands of state-chartered and federal-chartered financial institutions, most of which are small community banks and credit unions, "allow credit to flow to individuals and businesses, even in remote areas of our country."[8]

10.     The dual banking system owes its beginnings to the introduction of federally chartered banks with the passage of the National Bank Act of 1864.  Prior to that, commercial banks were initially organized under charters granted by state legislatures – a process that became highly politicized.  The next step was states' instituting free banking laws, which allowed anyone to open a bank as long as they could meet standards specified in a state's banking laws.  Then came the National Bank Act. The act's basic provisions mirrored key aspects of free banking laws that states had adopted – specifically free entry and flexibility to adapt to a changing economy.  "Thus began the competition between state and national bank charters and the emergence of the dual banking system."[9]

---

[6] Kenneth E. Scott, *The Dual Banking System:  A Model of Competition in Regulation*, 30 Stan. L. Rev. 1, 41 (1977).
[7] *Perspectives on 150 Years of Dual Banking*:   Conference of State Bank Supervisors, State-Federal Supervisory Forum, Savannah, Ga., May 22, 2012, Speaker, Esther L. George, Page 1.
[8] *Id.*
[9] *Id. at Page 2.*

11.     "[W]e have a stronger supervisory system – both at the state and the federal levels – as a result of dual banking."[10]  "One of the primary benefits of dual banking is that the multiple options for state and federal charters have led to considerable innovation and improvement in banking services.  We have seen these benefits from the beginning."[11]

12.     The dual banking system:

has allowed local bankers, state supervisors and state governments to construct a banking system closely attuned to the economic needs of each state and supervised by personnel with a strong knowledge of the structure and condition of the local economy.  State legislatures and supervisors have a long history of adopting their own set of prudential laws and regulations, consumer protection statutes, and bank chartering and expansion laws – all of which generally reflect the needs of each state.[12]

13.     "Another benefit of the dual banking system is that the option to choose a regulator has made banking supervision and regulation much stronger and more efficient."[13]

14.     The dual banking system provides for competition:

[C]ompetition is the process that makes market economies efficient. Choice among regulators provides an important incentive to improve examination processes and ensures examiners have timely training.[14] [P]roviding banks regulatory choice serves as a check and balance on supervisory authorities so that they are not so restrictive that banks are unable to provide the credit necessary for economic growth.[15]

15.     If the dual banking system is to serve us well going forward states must be provided "with enough leeway to continue to implement laws and supervise banks in a

---

[10] *Id.*

[11] *Id. at Page 3.*

[12] *Id.*

[13] *Id. at Page 4.*

[14] *Id.*

[15] *Id. at Page 5.*

manner most conducive to local interests and the state economy."[16] Federal laws are necessary in a national banking system but we must:

> strike the right balance in limiting the preemption of state laws and in respecting the authority of state supervisors and legislators. If we fail to achieve this balance, we risk losing many of the important benefits of the dual banking system.[17]

16.     The dual banking system has benefited the U.S. banking system and the overall economy since its establishment 153 years ago. "The diversity provided by this system allowed our economy to grow and to be the most vibrant, innovative and strongest in the world." The only way the dual banking system can continue to survive is if all federal and state chartered depository institutions have equal access to the Federal Reserve payments system on non-discriminatory terms. This case is about the unlawful refusal of FRB-KC to grant TFCCU equal access to the Federal Reserve payments system.

## THE FEDERAL RESERVE ACT

17.     Esther L. George, President of FRB-KC, has said:

> The Federal Reserve Act of 1913 established a framework for the nation's central bank that departed materially from that of the First and Second Banks of the United States. Congress rightly understood that the monolithic structure of these first two central banks was ill-suited to represent and serve the diverse interests, geographies and industries that make up the U.S. economy.[18]

18.     To ensure there was appropriate balance and regional representation, the Act called for 12 Reserve Banks to be located across the country.

---

[16] *Id.*

[17] *Id.*

[18] *Structure Matters: The Decentralized Federal Reserve*: The Exchequer Club, Washington, D.C., May 21, 2014, Speaker, Esther L. George, Page 2.

19.　　"Each Reserve Bank is overseen by a local Board of Directors composed of community and business leaders from diverse sectors across each of the 12 regions. These directors share governance responsibility for Reserve Bank operations along with the Board of Governors."[19]

20.　　Over the past century, the Federal Reserve's local connections have allowed each regional Reserve Bank to deliver financial services with "a deep understanding of regional interests."[20]　FRB-KC President Esther L. George has also stated:

> if Congress were to design the Federal Reserve System today, it might well choose to have 50 Reserve Banks rather than just 12.[21]

21.　　The system, by design, is intended to include "a diverse range of perspectives . . . [a] "cacophony of voices."[22]　The diversity of the Reserve Bank system reflects a democratic process "where a mosaic of perspective and input is sometimes messy."[23]　This structure: "by design, allows for dissenting views.　This feature recognizes the value Americans place on independent thinking."[24]　The system has "populist roots."[25]

22.　　The Federal Reserve Act brings diversity of experience, background and geography to the Federal Reserve's most challenging issues.　"A $17 trillion economy

---

[19] *Id. at Page 3.*

[20] *Id. at Page 4.*

[21] *Id. at Page 5.*

[22] *Id. at Page 6.*

[23] *Id. at Page 6.*

[24] *Id. at Page 6.*

[25] See, *The Federal Reserve and the Path of Monetary Policy*:　Omaha, Nebraska, September 6, 2013, Speech, Esther L. George, *Page 1.*

with complex dynamics is well-served by this process, which includes a range of viewpoints and inputs."[26]

23. Prior to the Monetary Control Act of 1980, not all depository institutions had equal access to a centralized payments system. Large commercial banks that were members of the Federal Reserve established an Automated Clearinghouse ("ACH") network and thereby largely controlled access to the U.S. centralized payments system. They used this control to monopolize the financial system, in unlawful restraint of trade, to their economic benefit. The controversy over ACH access policy was finally resolved by a pair of antitrust suits brought against the California and Rocky Mountain ACHs by the United States Department of Justice ("DOJ") in 1977. The DOJ argued that Federal Reserve subsidies of ACH services and the absence of explicit prices for these services created local monopolies in this area. The subsidies discouraged the emergence of a private sector competitor and so turned these ACHs into essential facilities. Therefore, the denial of direct access to all depository institutions placed those institutions at a competitive disadvantage with respect to commercial banks in violation of established antitrust laws.[27]

24. On the tail of the DOJ anti-trust suits, Congress acted. The Monetary Control Act of 1980 became a part of the Federal Reserve Act at 12 U.S.C. §248a. The Monetary Control Act requires the Federal Reserve to provide *all* depository institutions with equal access to Federal Reserve bank services at nondiscriminatory pricing. *See* 12 U.S.C. §248a(c)(2). This restored competition to the U.S. financial system. Thrifts and fledgling credit unions where placed on an equal footing with large commercial banks

---

[26] *Id. at page 6.*

[27] *See*, The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market, A. Kuprianov, *Economic Review*, July/August 1985.

that previously used their ACH network to control access to the Federal Reserve payments system. All depository institutions (Federal Reserve member and non-member) then had equal access to the payments system and hence equal ability to compete to serve customers. David was then allowed to compete with Goliath in respect of the provision of banking business.

25.     The Federal Reserve System's policy for the payment services it provides was stated in the white paper, "The Federal Reserve in the Payment System," published in the *Federal Reserve Bulletin* in May 1990, pp. 293-98. The paper stated that "[i]n summary, the role of the Federal Reserve in providing payment services is to promote the integrity and efficiency of the payments mechanism and to ensure the provision of payment services to all depository institutions on an equitable basis, and to do so in an atmosphere of competitive fairness."

26.     The dispute about access to the payments system, long settled, has arisen again in the context of this declaratory judgment action. The decision facing the Court turns upon the interpretation and application of 12 U.S.C. §248a(c)(2), the equal access provision of the Monetary Control Act. TFCCU seeks to enforce in this declaratory judgment action its federal statutory right, as a fledgling state-chartered credit union, to equal access to the payments system; a right granted by Congress to all depository institutions 35 years ago. Issues of central bank design were left to Congress. TFCCU seeks to compel FRB-KC to comply with the equal access law to which it is subject. FRB-KC must respect the 153 year-old constitutionally established dual banking system – and honor the structural design of the Federal Reserve System and its various components. The Tenth Amendment to the United States Constitution reserved to the

states the authority to charter financial institutions. Colorado issued a state charter to TFCCU. FRB-KC must honor that official state action and allow TFCCU access to the Federal Reserve payments system so it can operate. It is against this historical backdrop that this dispute between TFCCU, a state chartered credit union, and FRB-KC, an independent Reserve Bank, has arisen.

## FACTUAL BACKGROUND

27.    On January 10, 2014, United States Senators Michael Bennet (D-CO) and Mark Udall (D-CO), and Members of Congress Dianna DeGette (D-CO), Ed Perlmutter (D-CO), Mike Coffman (R-CO)and Jared Polis (D-CO) (the "Colorado Delegation") wrote Jennifer Shasky Calvery, Director, Financial Crimes Enforcement Network ("FinCEN"), United States Department of the Treasury and Deputy Attorney General James Cole, United States Department of Justice ("DOJ"). The letter requested that FinCEN and DOJ:

> …expedite guidance that would enable licensed marijuana dispensaries and retail stores in Colorado to avail themselves of the banking system . . . There has been significant uncertainty, however, as to whether these businesses will be able to accept checks or credit cards or to open accounts at insured depository institutions. The possibility of a cash-only system has raised significant public safety concerns for customers and employees who must now handle and transport large quantities of cash. Additionally, a cash-only system may make it more difficult for the state and federal government to regulate and audit these facilities. Finally, without access to the banking system, it may become easier for retail stores to avoid sales tax collections, which would diminish funding for marijuana enforcement activities and Colorado school construction.

28.    On February 14, 2014, in response to the letter from the Colorado Delegation and prompting from others that shared similar public safety concerns, the Department of Treasury, Financial Crimes Enforcement Network ("FinCEN"), issued formal federal guidance, FIN-2014-G001, entitled "BSA Expectations Regarding

Marijuana-Related Businesses" (the "FinCEN guidance") and James M. Cole, Deputy Attorney General, United States Department of Justice ("DOJ"), issued a "Memorandum for All United States Attorneys: Guidance Regarding Marijuana Related Financial Crimes" (the "Cole memorandum").

29.     FinCEN's guidance sought to clarify

> …how financial institutions can provide services to marijuana-related businesses ("MRBs") consistent with their Bank Secrecy Act ("BSA") obligations, and aligns the information provided by financial institutions in BSA reports with federal and state law enforcement priorities. This FinCEN guidance should enhance the availability of financial services for, and the financial transparency of, marijuana-related businesses. *Id.  FIN-2014-G001 at Page 1.*

30.     The FinCEN guidance was intended to facilitate state licensed marijuana-related business "access to financial services, while ensuring that this activity is transparent and the funds are going to regulated financial institutions responsible for implementing appropriate AML safeguards."[28] The "overarching goal" in issuing the guidance "was to promote financial transparency, ensuring law enforcement receives the reporting from financial institutions that it needs to police this activity and making it less likely that the financial operations move underground and become more difficult to track."[29]

31.     The Cole memorandum instructed U.S. Attorneys and law enforcement to focus on "eight priorities in enforcing the Controlled Substances Act ("CSA") against marijuana-related conduct."[30] The Cole memorandum stated that it is the federal

---

[28] Remarks of Jennifer Shasky Calvery, Director, Financial Crimes Enforcement Network, 2014 Mid-Atlantic AML Conference, Washington, DC, August 12, 2014, Page 5.

[29] *Id.* at Page 4.

[30] The eight priorities in enforcing the CSA against marijuana-related conduct are: (1) preventing the distribution of marijuana to minors; (2) preventing revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels; (3) preventing the diversion of marijuana from states where it is

expectation that states and local governments that have enacted laws authorizing marijuana-related conduct will implement strong and effective regulatory and enforcement systems to address the risks related to the legalized marijuana industry.

32.     The Colorado Bankers Association ("CBA") took the position that the fact FinCEN guidance and Cole memorandum intended to give banks federal permission to open accounts for state licensed marijuana businesses "only reinforces and reiterates that banks can be prosecuted for providing accounts to marijuana related businesses." CBA's press release stated:  "After a series of red lights, we expected the guidance to be a yellow one.  This isn't close to that.  At best this amounts to 'serve these customers at your own risk' and it emphasizes all of the risks.   This light is a red light." *See*, http://www.coloradobankers.org/?60.    As a result of this view, shared by many depository institutions, initially, the FinCEN guidance did not result in meaningful access to banking for MRBs.

33.     After FinCEN's guidance went into effect, between February 14 and August 8, 2014, 105 individual financial institutions from states in more than one third of the country engaged in banking relationships with marijuana-related businesses.[31] Nearly 400 financial institutions filed 3,157 marijuana-related suspicious activity reports in at least 42 states and the District of Columbia between February 14, 2014 and January 26, 2015.  Based on this data, FinCEN concluded that "banks are using our guidance and providing much needed transparency into their dealings with marijuana-related

---

legal under state law in some form to other states; (4) preventing state-authorized marijuana activity from being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity; (5) preventing violence and the use of firearms in the cultivation and distribution of marijuana; (6) preventing drugged driving and the exacerbation of other adverse public health consequences associated with marijuana use; (7) preventing the growing of marijuana on public lands and the attendant public safety and environmental dangers posed by marijuana production on public lands; and (8) preventing marijuana possession or use on federal property.
[31] *Calvery Remarks at Page 4.*

businesses."[32]  Each of these banks utilized the Federal Reserve payments system to serve MRBs.

34.    If the District of Columbia is counted as a state, there are 24 states that have legalized medical cannabis for distribution, taxation and regulation. Five of those states have gone further to legalize cannabis for adult use.[33]  An additional 15 states have legalized the use of low THC hemp based CBD oil for medical purposes. [34]  Furthermore, 20 states have allowed industrial hemp growing and cultivation with regulations that violate federal law.[35]  In total, there are only eight states (AR, ID, KS, LA, OH, PA, SD, WY) whose laws do not currently conflict with the federal Controlled Substances Act in some manner.  21 U.S.C. §801 *et seq.*  It is clear that the Federal Government's stance on cannabis prohibition is *not honored* by all but eight states.  The majority of those states have pending legislation to change their position as well. None of these state licensed, regulated, and taxed businesses have meaningful and stable access to traditional banking services. The few MRBs that have bank accounts are at constant risk of their accounts being closed all of the sudden. The majority of MRBs are forced to operate in cash only, and to suffer the high cost of handling and safeguarding this cash. The public is at risk in having hundreds of millions of dollars of cash flowing about the streets of Colorado. The 'seed-to-sale' state and municipal regulation of cannabis works – until the point of sale when a sale generates cash.

---

[32] *Id.*

[33] http://medicalmarijuana.procon.org/view.resource.php?resourceID=000881

[34]    http://www.celebstoner.com/news/marijuana-news/2014/03/13/four-states-on-verge-of-passing-cbd-only-laws/

[35] http://www.ncsl.org/research/agriculture-and-rural-development/state-industrial-hemp-statutes.aspx

35.     Aware of the significant public safety concerns presented by the nearly all-cash marijuana industry,[36] and the widespread lack of access of Colorado MRBs to banking services, ten (10) courageous citizens formulated a plan to solve the problem.  In March 2014, they came together to organize a Colorado state-chartered credit union to develop a robust anti-money laundering ("AML") program to comply with the newly issued FinCEN guidance and Cole memorandum and thereby provide much needed banking services to compliant, licensed cannabis and hemp businesses and to thousands of persons, businesses and organizations that supported the legalization of marijuana.  The plan to serve the MRB segment of its prospective field of membership would only be executed if authorized by state and federal law.  They formulated a local solution to a local problem.

36.     Martin Kenney, a world-renowned anti-fraud and anti-money-laundering expert, was the primary architect of the credit union's AML compliance program.[37]  Experts in the fields of law, banking, the principles of financial accounting of credit unions, academia, technology, insurance, marketing, marijuana regulation, government relations, law enforcement and state regulators were engaged in the collaborative process.

37.     The proposed credit union's business plan was straightforward – (i) build a Colorado state-chartered credit union around a culture of compliance; (ii) take compliance out from behind the desk and into the field; (iii) if service of MRBs is

---

[36] *Does Anybody Want $3 Billion in Cash from Pot Sales?* Geiger, Hamilton and Dexheimer, Bloomberg.com, May 15, 2015, http://www.bloomberg.com/news/articles/2015-05-12/banks-just-say-no-to-weed-as-treasury-pushes-the-business
[37] Martin Kenney, had, in June 2014, been given a lifetime achievement award from the Association of Certified Fraud Examiners ("ACFE") "for major lifetime contributions to the detection and deterrence of fraud."  The ACFE is the world's largest association of anti-fraud and anti-money laundering professionals (with 75,000 members in 160 countries).  The Cressey Award bestowed on Mr. Kenney is the ACFE's highest honor.

authorized by state and federal law, charge credit union members that required enhanced monitoring service fees commensurate with the cost of the enhanced due diligence required by the FinCEN guidance and Cole memorandum; (iv) diversify risk by including ordinary consumers who are members of any one or more of a number of not-for-profit associations within the credit union's field of membership, not just licensed cannabis and hemp businesses; (v) engage as credit union members the social movement that supports the legalization effort based upon a belief in personal liberty, state's rights and wellness; and (vi) become a regulatory partner with state and federal government to perform the "gatekeeper" function as envisioned by the FinCEN guidance and the Bank Secrecy Act ("BSA").

38.     On April 2, 2014, pursuant to C.R.S. §§11-30-101 *et seq.*, TFCCU applied to the Colorado Division of Financial Services ("DFS") for a *de novo* state credit union charter to serve a field of membership of persons, businesses, and organizations that support the legalized cannabis and hemp industries – by the submission of a voluminous charter application that laid out the proposed credit union's business plan.

39.     Upon receipt of the application for a state credit union charter, pursuant to C.R.S. §§11-30-101(1)(a), (3)(a) and (b), the Colorado State Commissioner of the DFS was required by law to determine: (a) whether TFCCU was a cooperative association established for the purpose of promoting thrift among its members and creating a source of credit at fair and reasonable rates of interest; (b) whether the proposed field of membership was limited to groups having a common bond of association; (c) whether the application conformed to the provisions of the Colorado Credit Union Act, C.R.S. §§11-30-101 *et seq.*; (d) whether such a credit union would benefit the members and proposed

members thereof, consistent with the purposes of the Act; (e) the general character and fitness of TFCCU's proposed incorporators and organizers; (f) the economic advisability of establishing the proposed credit union; (g) whether the incorporators and organizers were qualified; and (h) whether their qualifications and financial experience were consistent with their responsibilities and duties.

40.　　On July 2, 2014, Colorado DFS granted TFCCU a state credit union charter, conditioned upon TFCCU obtaining federal share deposit insurance from the NCUA.　The grant of the charter was based on statutorily required findings by the Colorado Commissioner of the DFS that: (a) TFCCU was a cooperative association established for the purpose of promoting thrift among its members and creating a source of credit at fair and reasonable rates of interest; (b) that TFCCU''s proposed field of membership was limited to groups having a common bond of association; (c) that TFCCU's application conformed to the provisions of the Colorado Credit Union Act, C.R.S. §§11-30-101 *et seq*.; (d) that TFCCU would benefit the members and proposed members thereof, consistent with the purposes of the Act; (e) that the general character and fitness of the incorporators was satisfactory; (f) that TFCCU was economically advisable; (g) that the incorporators and organizers were qualified; and (h) that their qualifications and financial experience were consistent with their responsibilities and duties.　The Commissioner's findings are entitled to a presumption of validity.

41.　　On July 18, 2014, in a letter to the State of Washington Department of Financial Institutions, NCUA Office of Examination and Insurance Director, Larry Fazio, stated the policy of the NCUA relative to the legal ability of federally chartered and federally insured state-chartered credit unions to provide services to marijuana-related

businesses: "NCUA has provided the FinCEN guidance to agency examiners, who are responsible for determining the compliance of financial institutions that provide service to marijuana-related businesses."

42.    On August 13, 2014, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation ("FDIC"), the NCUA and the Office of the Comptroller of the Currency (collectively, the "Agencies") issued a federal policy statement to the effect that the Agencies had formally incorporated the FinCEN guidance into their supervisory process. The Agencies reported that the federal policy related to federally regulated depository institutions banking MRBs is as follows:

> Generally, the decision to open, close or decline a particular account or relationship is made by a bank or credit union, without involvement by its supervisor. This decision may be based on the bank or credit union's particular business objectives, its evaluation of the risks associated with offering particular products or services, and its capacity to effectively manage those risks.

On December 2, 2014, the Agency included the FinCEN guidance into the Federal Financial Institutions Examination Council's Bank Secrecy Act/Anti-Money Laundering Examination Manual, thereby making the said guidance the standard upon which the conduct of financial institutions would be evaluated by bank and credit union examiners.

43.    FRB-KC policy allows depository institutions to use Reserve Bank services to serve MRBs, provided the depository institutions comply with the FinCEN guidance. TFCCU only intends to serve the MRB segment of its prospective field of membership if authorized by law.

44.    In August 2014, TFCCU submitted a *Routing Number Application* to ACCUITY, the official Registrar for the American Bankers Association. A Routing Number (also sometimes called an "ABA" number) is the number that identifies the bank

that is responsible to either pay or give credit or is entitled to receive payment or credit for a check or electronic transaction. *See* American Bankers Association Routing Number Administrative Board Routing Number Policy (Revised 3/12), Section I.

45.    In order to obtain a Routing Number, a bank must be "eligible to maintain an account at a Federal Reserve Bank." *Id.* at Section II. A.  ACCUITY coordinates with the Federal Reserve System on all policy issues and procedures. *Id.* at Section V, A, 4.  A representative of the Federal Reserve Bank is an Associate Member of the Routing Number Administrative Board.  *Id.* at Introduction.  As part of its review of a Routing Number Application, ACCUITY "may consult with the representatives of the appropriate Federal Reserve Bank and the applicant's chartering agency to confirm applicant bank's eligibility." *Id.* at Section V, C.

46.    The *Routing Number Application* states:  "Your request will be forwarded to the Federal Reserve in your district for verification.  When the application is returned to us from the Federal Reserve, we will send you an official assignment of the number."

47.    On August 25, 2014, Accuity, pursuant to the American Bankers Association Routing Number Policy (Revised 3/12), issued a Routing Number to TFCCU, thus determining TFCCU was eligible to maintain an account at a Federal Reserve Bank.

48.    To be eligible to open an account at a Federal Reserve Bank, an organization can be a state chartered "depository institution" as defined in 12 U.S.C. §461(b)(1)(A).  The term "depository institution" means – "(iv) any insured credit union as defined in section 1752 of this title or ***any credit union which is eligible to make***

***application to become an insured credit union*** pursuant to section 1781 of this title." *Id.* (emphasis supplied).

49.    The authority of a depository institution to provide financial or payment services is governed by the charter granted by the state regulatory authority. *See* American Bankers Association Routing Number Administrative Board Routing Number Policy (Revised 3/12), Introduction. The Routing Number simply identifies a chartered financial institution.

50.    On September 4, 2014, TFCCU submitted to the NCUA's Board a fully completed "NCUA Form 9600 – Application of a State Chartered Credit Union for Insurance of Accounts," together with all schedules and information required by NCUA Form 9600. NCUA Form 9600 is 16 pages in length; it contains 21 questions and calls for the submission of 7 schedules. TFCCU provided *all* information required to be provided with the application in respect to a deposit insurance application submitted by a new credit union.

51.    TFCCU also began exploring options to obtain private share deposit insurance in the event the NCUA declined its application for federal share deposit insurance.

52.    On November 19, 2014, the Colorado Commissioner of DFS granted TFCCU an *unconditional* Colorado state credit union Charter Number 272, pursuant to C.R.S. §11-30-117.5(3), that provides for the issuance of a final unconditional charter after a credit union "has applied for" share deposit insurance. Charter Number 272 states TFCCU is "authorized to conduct business pursuant to all of the powers conferred upon it by law, until this charter is suspended, revoked or otherwise surrendered in the manner

directed by statute." TFCCU takes this grant of authority to mean it must comply with both state and federal law, and it intends to do so.

53. Immediately after its state charter became final and unconditional, on November 19, 2014, TFCCU sought a master account at FRB-KC. *Every* depository institution must have (and does in fact have) access to the Federal Reserve payments system, either by having a master account, or by having access through a correspondent. Without such access, a depository institution is nothing more than a vault. Cash deposited at a financial institution is transported to the Federal Reserve branch. It is credited to the depository institution's account and the cash becomes an electronic credit. Credits and debits from transactions with other depository institutions are settled in the institution's account at the Federal Reserve Bank where an institution's master account is maintained. In basic terms, an account at the Federal Reserve is the depository institution's bank account.

54. Federal Reserve Banks Operating Circular No. 1, ACCOUNT RELATIONSHIPS (Effective February 1, 2013), and its appendices - Appendix 1, Master Account Agreement (Revised September 2011) and Appendix 2, Transaction and Service Fee Settlement Authorization Form (Last updated 6/13), set forth the terms under which a depository institution may open a Master Account with its Administrative Reserve Bank ("ARB").

55. TFCCU, a Colorado state-chartered credit union, is located in the Tenth Federal Reserve District. As such, its ARB is FRB-KC.

56. In order to establish a Master account with its ARB:

…the Board of Directors of a Financial Institution must pass resolutions
(in a form prescribed by the Reserve Banks) that authorize certain

individuals to conduct business on behalf of the Financial Institution ("Authorized Individuals"). The Financial Institution must provide its ARB with a certified copy of the resolutions as well as an Official Authorization List ("OAL")which identifies Authorized Individuals. An Authorized Individual must then execute a Master Account Agreement (Appendix 1) . . . to open a Master Account [on behalf of a Financial Institution]. By opening or maintaining a Master Account, a Financial Institution agrees to be bound by all the provisions, as amended from time to time, of this Circular and of all other Federal Reserve Bank operating circulars that cover services that it obtains from any Reserve Bank. Each Maser Account Agreement is subject to approval by the Financial Institution's Administrative Reserve Bank. *See* Federal Reserve Bank Operating Circular No. 1 (Effective February 1, 2013), Section 2.6.

57.     The Federal Reserve Bank, Operating Circular 1, Appendix 1, Master Account Agreement (Revised September 2011) is 1 page in length. Section 1 of the Agreement asks for the depository institution's "Routing (ABA) Number," its address, an "Official Signature" and an "Anticipated Account Opening Date." Sections 2 and 3 of the Agreement ask the depository institution to identify the employee to whom questions regarding the account should be directed. The Agreement does not require the submittal of *any* documents other than a Resolution Authorizing an Institution to Open and Maintain Accounts and Use Services (version 6.18.04) and a Federal Reserve Bank Official Authorizations List (Last Updated 08/12). A footnote contained at the bottom of the Master Account Agreement states: "Processing may take 5-7 business days. Please contact the Federal Reserve Bank to confirm the date that the master account will be established." There is no designated application form for a Master Account – the only documents involved are the Master Account Agreement, the OAL and the Resolution.

58.     On or about November 19, 2014, TFCCU submitted a duly executed certified Resolution Authorizing an Institution to Open and Maintain Accounts and Use

Services (version 6.18.04) (the "Resolution") and a Federal Reserve Bank Official Authorizations List (Last Updated 08/12) (the "OAL") to FRB-KC.

59. Shortly after submission, FRB-KC's Financial Management department approved FCCU's Resolution and OAL. Approval involved an employee in the Financial Management department at FRB-KC verifying the authenticity of the signatures on the Resolution and OAL and that the forms were properly completed.

60. TFCCU representatives then worked with the Customer Relations and Support Office at Federal Reserve Financial Services in Minneapolis, Minnesota to complete the standard forms to select the various Reserve Bank services desired by TFCCU.

61. Following FRB-KC's approval of the Resolution and OAL, FRB-KC refused to lodge TFCCU's OAL and Resolution into FRB-KC's legal documents archives and further refused to allow TFCCU to submit an executed Master Account Agreement (Revised September 2011) to open a master account, stating that: "the Board Resolution and Official Authorization List will be processed . . . upon approval by credit and risk."

62. TFCCU's legal counsel immediately contacted FRB-KC and asked to be provided with the rules pertaining to approval by credit and risk and was advised that no such rules exist.

63. After receiving TFCCU's request for a master account, FRB-KC delayed acting upon TFCCU's request for almost nine (9) months.

64. The processing of a master account request is a routine ministerial act that does not involve the submission of an application, the review of an application or the exercise of discretion by FRB-KC.

65.     It normally takes 5 to 7 days to process an application for a master account.  (*See*, footnote to standard form FRB Master Account Agreement.)

66.     A request for a master account is *processed* by FRB-KC, not decided upon.

67.     The Master Account Agreement is a *one-page* form seeking only the "Routing (ABA) Number," the financial institution name and address, and the "Anticipated Account Opening Date."  *See* Federal Reserve Bank Operating Circular 1, Appendix 1 (Revised September 2011), Master Account Agreement.

68.     The only required submittals to obtain a Master Account are a Routing (ABA) Number, a board resolution and an authorized signer list.

69.     The scant master account agreement and absence of submittal requirements establish that no discretion is utilized in the routine process of opening a master account.

70.     The absence of transparently displayed or published written criteria (to be used in the exercise of a discretion) is further proof that the process is ministerial.

71.     FRB-KC is not a regulatory agency.  As such, its decisions are subject to *de novo* review, and are not entitled to deference from this Court.

72.     FRB-KC does not regulate state-chartered credit unions.

73.     FRB-KC provides Federal Reserve payment services to state-chartered credit unions.

74.     The Federal Reserve provides four important payment services:  (1) a centralized check collection system, (2) the Automated Clearinghouse (ACH) network for processing batched electronic small-dollar payments, (3) the Fedwire system for

larger electronic payments, and (4) coin and currency services. *See* 12 U.S.C. §248a(b)(1) through (8).

75.    Depository institutions use each of these Federal Reserve services to provide customers payment services.

76.    The Monetary Control Act of 1980 requires that the Federal Reserve offer payments system services to all "depository institutions," regardless of whether the institution is a member of the Federal Reserve System. *See* 12 U.S.C. §248a(c)(2). Thus, the Federal Reserve currently provides services to banks and credit unions alike.

77.    By establishing regulations and policies governing access to its payment systems, the Board of Governors of the Federal Reserve System has the ability to uniformly impact practices at *all* financial institutions using these systems. *See* 12 U.S.C. §248(k).

78.    Accessing the Federal Reserve's payment systems is not administratively difficult. It requires only a resolution from the financial institution's board of directors and the completion of forms designating individuals authorized to initiate transactions and identifying the types of services wanted. *See* Operating Circular No. 1 (Effective February 1, 2013), Section 2.6.

79.    In providing access to the payment systems, the Federal Reserve does not investigate the financial institution's customers. Indeed, the Federal Reserve's risk management policy in effect when TFCCU submitted its request for a master account explicitly avoids comment on "relationships between financial institutions and their customers," concluding that "relevant safety and soundness issues associated with these relationships are more appropriately addressed through the bank supervisory process."

*See* Board of Governors of the Federal Reserve System, Reserve Policy on Payment System Risk at Page 6 (March 24, 2011), available at http://www.federalreserve.gov/paymentssystems/files/psr_policy.pdf.  On December 31, 2014, the Federal Reserve amended its Policy on Payment System Risk by removing the above quoted sentence.

80.    Pursuant to 12 U.S.C. §248a(c)(2):

All Federal Reserve bank services covered by the fee schedule **shall be available to nonmember depository institutions** and such services **shall be priced at the same fee schedule applicable to member banks**, except that nonmembers shall be subject to any other terms, including a requirement of balances sufficient for clearing purposes, that the Board may be determine are applicable to member banks.  (*emphasis supplied*).

81.    Pursuant to 12 U.S.C. §248a(e):

All depository institutions, as defined in section 456(b)(1) of this title, may receive for deposit and as deposits any evidences of transaction accounts, as defined in section 461(b)(1) of this title from other depository institutions, as defined in section 461(b)(1) of this title or from any office of any Federal Reserve bank without regard to any Federal or State law restricting the number or the physical location or locations of such depository institutions.

82.    Pursuant to 12 U.S.C. §360:

Every Federal reserve bank shall receive on deposit at par from depository institutions . . . checks and other items . . . drawn by any depositor in any other Federal reserve bank or depository institution upon funds to the credit of said depositor in said reserve bank or depository institution . . .

83.    Pursuant to 12 C.F.R. §210.3(a):

Each Reserve Bank shall receive and handle items in accordance with this subpart and shall issue operating circulars governing the details of handling of items and other matters deemed appropriate by the Reserve Bank.  The circulars may, among other things, . . set forth terms of services . . .

84.     Pursuant to 12 U.S.C. §461(b)(1)(A) - the term "depository institution" means – "(iv) any insured credit union as defined in section 1752 of this title or any credit union which is eligible to make application to become an insured credit union pursuant to section 1781 of this title."

85.     TFCCU is a credit union organized and existing according to the laws of Colorado.

86.     TFCCU is eligible to make application to become an insured credit union pursuant to 12 U.S.C. §1781.

87.     Pursuant to 12 U.S.C. §1781(b), TFCCU may make application for insurance of member accounts "at any time."

88.     Pursuant to C.R.S. §11-30-117.5(3), a Colorado credit union may be granted an unconditional charter once "it has applied for insurance on its shares and deposits as provided in this section."

89.     Pursuant to C.R.S. §11-30-117.5(1), a Colorado credit union must apply for insurance of its shares and deposits under 12 U.S.C. §1781 (federal share deposit insurance administered by the NCUA), or comparable insurance approved by the commissioner (otherwise known as private share deposit insurance).

90.     On or about December 1, 2014, FRB-KC asked the NCUA if TFCCU was "eligible to make application to become an insured credit union" pursuant to 12 U.S.C. §1781.  The reason the question was posed in this precise manner is because *if* TFCCU was "eligible to make application to become" a federally insured credit union, it was eligible for a master account at FRB-KC, pursuant to the Monetary Control Act of 1980, 12 U.S.C §248a(c)(2), Federal Reserve Banks Operating Circular 1, Account

Relationships, Effective February 1, 2013 and the American Bankers Association Routing Number Administrative Board Routing Number Policy, Section II (Revised 3/12).

91.    A new state-chartered credit union is entitled to a master account irrespective of whether is has *obtained* federal share deposit insurance; it only need be "eligible to make application to become" federally insured.

92.    A state-chartered credit union is not required by federal law to have federal deposit insurance from the NCUA or private share deposit insurance as a precondition to having a master account at a Reserve Bank.

93.    The deposits of almost all state chartered credit unions are either federally insured or privately insured.

94.    Currently, there are approximately 129 operating credit unions that have *private* (primary) share deposit insurance. Each of these 129 privately insured credit unions have access to the Federal Reserve payments system.

95.    The NCUA does not oversee state-chartered, privately insured credit unions. There are over 6,000 state and federal credit unions whose deposits are insured (to up to $250,000 per member account) by the fund administered by the NCUA.

96.    A state-chartered credit union with private share deposit insurance is not subject to NCUA regulation, supervision or examination.

97.    As a policy matter, in 2007 NCUA issued a report to Congress concluding that the NCUA should be the sole provider of primary deposit insurance.

98.     The NCUA has tried for 8 years, without success, to get Congressional support for its plan to abolish private primary deposit insurance. The NCUA wants to exert federal control over all state-chartered credit unions.

99.     On December 19, 2014, TFCCU attorney Douglas Friednash of Brownstein Hyatt Farber Schreck (Denver) wrote Ms. Laster to advise that the NCUA failed to respond to the direct question raised by the Federal Reserve Bank of Kansas City as to whether TFCCU was "eligible to make application to become" insured by the National Credit Union Share Insurance Fund ("NCUSIF").

100.    On January 7, 2015, Esther L. George, FRB-KC President, issued a letter to TFCCU's legal counsel setting forth FRB-KC's legal position that stated, in pertinent part, as follows:

> As you note in your letter, Operating Circular 1 sets forth the terms under which a financial institution may open a master account with a Reserve Bank. The Operating Circular also states that a master account is subject to other applicable Federal Reserve regulations and policies relating to accounts maintained with a Reserve Bank. These include policies related to risk posed by a financial institution and how that risk will be mitigated when determining whether and under what conditions an account may be opened. ***Issuance of a master account is within the Reserve Bank's discretion*** and requires that the Reserve Bank be in a position to clearly identify the risk(s) posed by a financial institution and how that risk can be managed to the satisfaction of the Reserve Bank. In the case of TFCCU, we will consider TFCCU's response to the National Credit Union Administration, along with other relevant information, in our evaluation of its application for an account. (*emphasis supplied*).

101.    Upon information and belief, on or about January 13, 2015, the NCUA advised FRB-KC in writing that TFCCU was eligible to make application to become federally insured by the NCUA. TFCCU was not provided with a copy of this communication.

102.    On January 20, 2015, TFCCU attorney Steven W. Farber wrote FRB-KC President George indicating that:

> TFCCU is a 'depository institution' entitled to a master account at the FRB, based on the NCUA's confirmation of its eligibility to make application to become an insured. With this confirmation, combined with the required documentation previously submitted, TFCCU respectfully renews its request for the establishment of a master account at the FRB, subject to the execution of a master account agreement in the prescribed form.

103.    On March 6, 2015, United States Senator Michael F. Bennet (D-CO) wrote a letter to Janet Yellen, Chair, Board of Governors of the Federal Reserve System and Esther L. George, President, Federal Reserve Bank of Kansas City. Senator Bennet advised Ms. Yellen and Ms. George that the nearly all-cash nature of Colorado state legal cannabis businesses "raised significant public safety concerns" and that the "cash only nature of these businesses has also made it more difficult for the state to audit these entities and to conduct oversight." The letter requested that the Reserve Bank "work directly with the credit union to the extent that it has not satisfied the necessary terms and conditions to open a master account."

104.    On March 19, 2015, TFCCU's CEO Deirdra O'Gorman wrote Ms. Yellen and Ms. George to request a meeting:

> to elaborate on TFCCU's compliance, risk management, enhanced due diligence protocols, and that state's robust regulatory structure, to the extent such information is pertinent to the FRB's determination of the risk(s) posed by the financial institution and how that risk can be managed to the satisfaction of the Reserve Bank.

105.    Ms. Yellen and FRB-KC declined to meet with TFCCU representatives. FRB-KC specifically instructed TFCCU not to submit any more documentation to FRB-KC.

106.    On or about April 9, 2015, FRB-KC President Esther L. George visited Denver to meet with political leaders, bank and credit union officials, and representatives of Colorado's state legal cannabis industry.    Following the meeting, FRB-KC issued a statement that FRB-KC "has a role in ensuring the financial system's safety and soundness in the state of Colorado and to gather information from local businesses and community leaders."

107.    After receiving Senator Bennet's letter and after having met with Colorado businesses and community leaders, in April 2015, FRB-KC formulated a proposed written response to TFCCU's request for a master account and circulated that response to various agencies and persons, including but not limited to, the NCUA.

108.    FRB-KC was prepared to issue its proposed response to TFCCU's request for a master account, until, according to FRB-KC, the "NCUA went dark."

109.    The communications relating to FRB-KC's proposed response to TFCCU's request for a master account that were circulated amongst third-parties are not subject to any legal privilege and are discoverable in this action.

110.    Upon information and belief, the NCUA and FRB-KC, acted in concert to unlawfully deny TFCCU access to the Federal Reserve payments system.

111.    On July 1, 2015, Janet L. Yellen, Chair of the Board of Governors of the Federal Reserve System, wrote United States Senator Michael F. Bennet (D-CO) regarding TFCCU's request for a master account stating:

> As you know, this case raises issues regarding compliance with Federal law, which currently prohibits certain activities related to marijuana.  This matter is also pending before the National Credit Union Administration, which is considering whether FCCU qualifies for deposit insurance under Federal law.

112. On July 2, 2015, the NCUA Office of Consumer Protection issued a letter of disapproval of TFCC's application for federal share deposit insurance. The NCUA secretly and unlawfully provided a copy of this confidential letter to FRB-KC. The NCUA's actions are the subject of a related lawsuit filed in this Court that *directly* attacks the NCUA's conduct as unlawful, contrary to constitutional right, in excess of statutory jurisdiction, made without procedure required by law, not supported by substantial evidence, arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

113. The NCUA's July 2, 2015 letter of disapproval does not provide an evidentiary basis for FRB-KC's denial of TFCCU's master account request.

114. On July 16, 2015, TFCCU's lawyers advised the NCUA's lawyers and its decisional employees that participated in the call that the NCUA acted unlawfully and that its actions would be challenged in court unless the NCUA withdrew its contrived letter of July 2, 2015.

115. Upon information and belief, following this call, representatives of the NCUA engaged in unlawful communications with FRB-KC relative to TFCCU's share deposit insurance application. The purpose of these unlawful communications was so that the NCUA and FRB-KC could coordinate a denial of TFCCU's request for a master account (based on the NCUA's July 2, 2015 letter) before litigation ensued. These communications are not privileged and are subject to discovery in this proceeding.

116. On July 16, 2015, FRB-KC denied TFCCU's request for a master account based upon "information TFCCU has provided to the Bank and the National Credit Union Association (*sic* – its Administration – not Association) (NCUA), as well as the

NCUA's denial of insurance . . ." FRB-KC stated it had "reviewed the NCUA's analysis and denial of TFCCU's application for insurance of accounts." FRB-KC cited no legal authority for its action.

117. FRB-KC is owned and controlled by large commercial member banks. These banks currently deposit a substantial amount of state legal cannabis money into the Federal Reserve payments system. TFCCU is a putative competitor that also seeks to provide services to MRBs. A key distinction between the fledgling TFCCU and these large commercial banks is that TFCCU is a nonprofit, cooperative financial institution to be owned and run by its members. This is the cement that unites credit union members in a cooperative venture – in a way banks cannot.

118. The Federal Reserve must allow *all* depository institutions equal access to the Federal Reserve payments system on nondiscriminatory terms. Federal Reserve policy permits all participants in the Federal Reserve payments system to provide services to MRBs consistent with the FinCEN guidance. When TFCCU is granted access to the Federal Reserve payments system it will have the ability to compete with FRB-KC's owners for the business of a newly emerging fast-growing industry. TFCCU only intends to serve the potential MRB segment of its membership if authorized by state and federal law. The competition for business that exists between banks and credit unions is legendary. Thus, the law provides for only *very* limited information sharing between the NCUA and the Federal Reserve.[38] Also, the law prevents FRB-KC's owners (the commercial member banks) from playing a discretionary role in deciding who gets into

---

[38] *See*, 12 U.S.C. 1784(g) that permits the NCUA Board to share information about a credit union with Federal Reserve banks "for the purpose of facilitating insured credit unions' access to liquidity" provided the Federal Reserve bank gives "appropriate assurances of confidentiality."

the monopolistic payments system, and who is kept out. All depository institutions get in so they have a fair opportunity to compete.

119.     TFCCU does not need NCUA insurance to operate, or to gain access to the Federal Reserve. It has the ability to pursue a private share deposit insurance option. Further, insurance is *not* a legal prerequisite to having a master account. The NCUA is on record that it is against private share deposit insurance because the NCUA has no authority to supervise, regulate or examine privately insured state chartered credit unions. Apparently, the NCUA does not trust highly qualified state regulators with superior local knowledge to supervise state-chartered credit unions without NCUA oversight. Thus, in order to carry out their nefarious scheme to unlawfully block TFCCU from the Federal Reserve payments system, FRB-KC and the NCUA concocted an aggressively expressed denial of the federal deposit insurance application that *also* gratuitously impugned the reputations and work of the multitude of highly qualified professionals that worked on TFCCU's business plan and its AML compliance model, manual and systems. At the same time, the NCUA and FRB-KC impugned the Colorado regulators that approved TFCCU's charter and the Colorado elected officials that supported TFCCU's effort to solve a serious public safety problem.

120.     Upon information and belief, representatives of FRB-KC had improper and unlawful *ex parte* conversations with NCUA decisional employees about confidential information provided to the NCUA by TFCCU, as well as about the merits of TFCCU's pending federal share deposit insurance application and its pending request for a master account.

121.     The Federal Reserve System plays a major role in developing and operating the nation's payments system.

122.     FRB-KC is required to provide payments services to all depository institutions on equal terms.  *See* 12 U.S.C. §248a(c)(2).

123.     The Federal Reserve payments system is a monopoly, since no alternatives to the Federal Reserve payments system services exist at this time.

124.     FRB-KC is required to provide equal access to its essential facilities on reasonable and nondiscriminatory terms.

125.     In the context of anti-trust law, the payments system is an "essential" facility in that it provides significant competitive advantages to any market participants that have direct access to that facility.

126.     The denial of direct access to Federal Reserve payments system services places TFCCU at a competitive disadvantage with respect to all other depository institutions that have been granted equal access and nondiscriminatory pricing for the said services.

127.     By denying TFCCU access to the Federal Reserve payments system, FRB-KC has engaged in an unreasonable restraint of trade and commerce.

128.     Operating rules cannot be used to discriminatorily exclude TFCCU from the Federal Reserve payments system, an essential facility.  Operating Rules are overridden by the governing statute, 12 U.S.C. §248a(c)(2).

129.     The Board of Governors of the Federal Reserve System *could* adopt a rule or policy that strictly prohibits *all* financial institutions from using Reserve Bank services to bank the marijuana industry because marijuana remains federally illegal.  However, it

has not.  Rather, the Board of Governors adopted a rule that allows *all* depository institutions to provide services to MRBs, provided they comply with the FinCEN guidance and the Cole memorandum.  Whatever the rule is, it must be applied equally and not discriminate.  Whatever the law is, TFCCU will obey.

130.    FRB-KC must provide all depository institutions equal access to the payments system.  *See* 12 U.S.C. §248a(c)(2).  This requires it make the payments system universally accessible to depository institutions, including small, remote, and newly chartered institutions.

131.    A new state-chartered credit union is entitled to a master account.

132.    The law does not require a state-chartered credit union to have a history of performance or historical record before it can have a master account.

133.    The law does not require a new state-chartered credit union to have reserves (until it accumulates deposits), or be adequately capitalized to have a master account.

134.    Credit unions (as cooperatives that do not issue capital stock) initially have no net worth and credit unions, according to law, are granted a reasonable time to accumulate net worth. 12 U.S.C. §1790d(b)(1)(B).

135.    New credit unions have 10 years to become adequately capitalized.  *Id.*

136.    A credit union is adequately capitalized if it has a net worth ratio of not less than 6 percent.  12 U.S.C. §1790d(2)(B)(c)(1)(B).

137.    The Federal Reserve is required to serve all U.S. depository institutions equitably.  *See* 12 U.S.C.§301.  It is required to tie all depository institutions into one unified system.

138.    The Federal Reserve's operational role is to ensure all depository institutions have access to its services.

139.    TFCCU qualifies as a customer of the FRB and is entitled to its monopoly-like services.

140.    The Federal Reserve payments system is a publicly produced and subsidized payments system that is an essential facility that must be offered on a nondiscriminatory basis to depository institutions.

141.    FRB-KC has engaged in unlawful anti-competitive activity by denying TFCCU equal, competitive, nondiscriminatory access to its payments system in violation of 12 U.S.C. §248a(c)(2).

142.    FRB-KC's denial of TFCCU's master account application is anti-competitive; it is detrimental to public safety; it is an abuse of monopoly power; it is a collusive practice in restraint of trade; and it is statutorily and constitutionally unlawful.

143.    FRB-KC has failed to administer the affairs of FRB-KC fairly and impartially and without discrimination in favor of or against any depository institution in violation of 12 U.S.C. §301.

## FOR A FIRST CAUSE OF ACTION

### (Declaratory Judgment)

### (TFCCU is entitled to a Master Account at FRB-KC)

144.    Plaintiff repeats and realleges the foregoing allegations of the Complaint as if set forth herein verbatim.

145.    There exists a case of actual controversy in the constitutional sense - a real and substantial controversy admitting of specific relief through a decree of a conclusive

character between TFCCU and FRB-KC that pertains to the proper legal interpretation of 12 U.S.C. §248a(c)(2), Federal Reserve Banks Operating Circular No. 1 (Effective February 1, 2013) and the American Bankers Association Routing Number Administrative Board Routing Number Policy (Revised 3/12).

146.    This Court should declare the rights and other legal relations of TFCCU under 12 U.S.C. §248a(c)(2), Federal Reserve Banks Operating Circular 1 (Effective February 1, 2013) and the American Bankers Association Routing Number Administrative Board Routing Number Policy (Revised 3/12) because judgment by this Court would settle the legal issues involved, it would finalize the controversy and offer the parties relief from uncertainty.

147.    12 U.S.C. §248a(c)(2) requires that "All Federal Reserve bank services covered by the fee schedule *shall be available to nonmember depository institutions* and such services *shall be priced at the same fee schedule applicable to member banks*, . . ."

148.    Operating rules, such as Federal Reserve Banks Operating Circular 1 (Effective February 1, 2013) cannot be used to exclude TFCCU from the Federal Reserve payments system, an essential facility, nor can they override the equal access and nondiscriminatory pricing requirements of federal law.  12 U.S.C. §248a(c)(2.

149.    TFCCU is a nonmember depository institution.

150.    FRB-KC has refused to make "Federal Reserve bank services covered by the fee schedule" available to TFCCU in violation of 12 U.S.C. §248a(c)(2).

151.    12 U.S.C. §248a(c)(2) is mandatory, in that it provides that Federal Reserve Banks' services "shall" be made available to non-member depository institutions.

152.     FRB-KC does not have discretion to decide which non-member depository institutions are entitled to Federal Reserve Bank services.  The word "shall" connotes a mandatory requirement, not subject to discretionary whim.

153.     FRB-KC must provide equal access and non-discriminatory pricing to Federal Reserve bank services to all depository institutions.

154.     Federal Reserve Banks Operating Circular No. 1 states: "Each Master Account Agreement is subject to approval by the Financial Institution's Administrative Reserve Bank."  *See* Operating Circular No. 1 (Effective February 1, 2013), Section 2.6. The approval referenced in OC-1 is *not* a discretionary approval.  OC-1 calls for FRB-KC to process a master account application by verifying that a resolution from the financial institution's board of directors has been duly executed and that the depository institution has completed the forms designating individuals authorized to initiate transactions and identifying the types of services wanted.

155.     The Federal Reserve Act does not grant the Board of Governors of the Federal Reserve System or FRB-KC the authority or power to discriminate in favor of or against any depository institution in the provision of Federal Reserve Bank services. Rather, the Act requires a Reserve Bank "to administer the affairs of said bank fairly and impartially and without discrimination in favor of or against" any depository institution. *See* 12 U.S.C.§301.

156.     There exists no policies or procedures for the exercise of the claimed discretion by FRB-KC in the routine processing of a master account application.  In the alternative, and in the event that the court determines FRB-KC has discretion in the issuance of master account, FRB-KC made the wrong decision in denying the request and

this court should consider a *de novo* review and render a decision. In such a proceeding, FRB-KC's decision is not entitled to judicial deference.

157.   *After* access is granted, OC-1 provides operating rules that are uniformly applicable to all depository institutions pertaining to terminating or maintaining a master account, settlement, statements, overdrafts and sensitive consumer information. TFCCU intends to comply with the operating rules applicable to all depository institutions.

158.   Upon information and belief, since the passage of the Monetary Control Act in 1980, FRB-KC has never refused to grant a federal or state chartered depository institution a master account, nor has FRB-KC ever exercised discretion in the processing of a master account application.

159.   FRB-KC routinely and administratively processes master account applications within 5 to 7 days.

160.   FRB-KC's stated legal position is that "***Issuance of a master account is within the Reserve Bank's discretion*** and requires that the Reserve Bank be in a position to clearly identify the risk(s) posed by a financial institution and how that risk can be managed to the satisfaction of the Reserve Bank."

161.   FRB-KC does not regulate or supervise TFCCU.

162.   Colorado DFS is TFCCU's sole regulator and supervisor.

163.   Colorado DFS granted TFCCU a charter and in doing so, it exercised its discretion, pursuant to C.R.S. §11-30-101(3)(a) and (b), to determine TFCCU's safety and soundness. Said decision is entitled to a presumption of validity.

164.   Under the dual banking structure, FRB-KC does not have jurisdiction to second-guess Colorado DFS, or to reject its determination.

165. A state charter was issued. According to federal law, access to the Federal Reserve payments system must be granted.

166. FRB-KC has stated that, in the exercise of its claimed discretion in the routine processing of a master account application, that: "In the case of [T]FCCU, we will consider [T]FCCU's response to the National Credit Union Administration, along with other relevant information, in our evaluation of its application for an account."

167. Under the federal statutory scheme, a state-chartered credit union is entitled to a master account if it is *eligible to make application to become insured* by the NCUA. *See* 12 U.S.C. §461(b)(1)(A)(iv).

168. The existence of federal share deposit insurance is not a prerequisite for a state-chartered credit union to obtain a master account.

169. The existence of private share deposit insurance is not a prerequisite for a state-chartered credit union to obtain a master account.

170. For a state chartered credit union the requirement that deposits be insured is a feature of state law.  C.R.S. §11-30-117.5.

171. A state has the authority to determine what type of deposit insurance satisfies state law requirements.

172. Pursuant to C.R.S. §11-30-117.5(1), TFCCU may seek permission of the Colorado Commissioner of DFS to obtain private share deposit insurance in which case TFCCU would not be supervised, regulated, or examined by the NCUA.

173. The statutory scheme is such that an FRB master account is the cart that comes before the horse – the horse being share deposit insurance (either federal or private).

174.     Pursuant to 28 U.S.C. §2201 and Rule 57 of the Federal Rules of Civil Procedure, TFCCU respectfully requests this Court issue a judgment declaring and an injunction requiring that FRB-KC must grant TFCCU a master account at FRB-KC, pursuant to 12 U.S.C. §248a(c)(2) which requires that "All Federal Reserve bank services covered by the fee schedule ***shall be available to nonmember depository institutions*** and such services ***shall be priced at the same fee schedule applicable to member banks***, . . ." and in accordance with Federal Reserve Banks Operating Circular No. 1 (Effective February 1, 2013) and the American Bankers Association Routing Number Administrative Board Routing Number Policy (Revised 3/12).  In that this is an action to enforce a federal statute, the decision (unless there is statutory language to the contrary) is simply whether a particular means of enforcing the statute should be chosen over other permissible means; not whether enforcement is preferable to no enforcement at all. Alternatively, if the court were to apply the traditional test for injunctive relief, TFCCU has established it is entitled to such relief because it would suffer irreparable injury if it is not issued a master account; it has no adequate remedy at law; under a balance of hardships between plaintiff and defendant the relief is warranted; and the public interest would be served by judicial recognition of the sovereign act of Colorado in the issuance of the charter.

**WHEREFORE**, TFCCU prays unto this Honorable Court as follows:

1.     For a declaratory judgment and injunction directing FRB-KC to immediately grant TFCCU, a Colorado state-chartered credit union, a master account at FRB-KC;

2.    For an order providing for a speedy hearing on this declaratory judgment action, thereby advancing this cause on the Court's calendar as permitted by F.R.C.P., Rule 57; and

3.    For such other and further relief as this Court may deem just and proper.


Date:   September 30, 2015                    Respectfully submitted,

                                              *s/*Mark A. Mason
                                              **Mark A. Mason**
                                              **Gabrielle Z. Lee**
                                              *Counsel of Record*
                                              THE MASON LAW FIRM, P.A.
                                              Tidewatch Centre on Shem Creek
                                              465 W. Coleman Boulevard, Suite 302
                                              Mount Pleasant, South Carolina
                                              Telephone: (843) 884-1444
                                              FAX: (843) 884-3595
                                              E-mail: mark@masonlawfirm.com

                                              *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on this 30th day of September 2015, a true and correct copy of the foregoing was filed electronically.  Notice of this filing will be sent to all counsel of record by the operation of the Court's CM/ECF system.


                                   s/ Mark A. Mason
                                   **Mark A. Mason**